355 So.2d 1255 (1978)
SENTRY WATER SYSTEMS, INC., Appellant,
v.
ADCA CORPORATION, Appellee.
No. 77-574.
District Court of Appeal of Florida, Second District.
March 10, 1978.
Earl I. Rosenthal, Punta Gorda, for appellant.
Robert G. Jacobson of Farr, Farr, Haymans, Moseley & Odom, Port Charlotte, for appellee.
OTT, Judge.
This is an action by the appellant/landlord against the appellee/tenant for various damages including unpaid rentals and increased costs of insurance for fire and windstorm coverage. The appellee/defendant defended and counterclaimed on the ground of constructive eviction. The trial court ruled that the facts established a constructive eviction of the appellee by the appellant which constituted a complete defense to the action and a right to recover on the counterclaim. We reverse and hold that the evidence when considered in the light most favorable to the appellee failed, as a matter of law, to establish constructive eviction.
The trial was a far cry from a model in the marshalling and presentation of the evidence establishing the essential elements of the claims of the two parties. We have examined the record and gleaned the following facts as those most favorable to the appellee.
The parties entered into a written commercial lease of premises from which the tenant proposed to operate his business as a building contractor. The lease was entered into in January of 1975, was to commence on February 1, 1975 and was to run for a *1256 period terminating on December 31, 1977  approximately three years. The monthly rental was $582.50. Insofar as material to the controversy the pertinent provisions of the lease were as follows:
Paragraph 5 of the lease provided in relevant part:
It is further understood and agreed that the Lessee shall construct a substantial frame fire-resistent interior wall with a minimum 5/8 [inch] drywall construction which shall be satisfactory to the Lessor, and which shall meet all the State and local health and safety regulations; . .
Paragraph 6 of the lease stated:
The Lessee promises and agrees to keep the premises adequately insured against fire and windstorm, and shall carry public liability insurance indemnifying and affording protection to the Lessor against claims of persons injured upon the premises.
On May 13, 1975 the appellant was notified by the fire insurance company of various violations of the Charlotte County fire regulations that existed on the premises occupied by the appellee under the lease. Unless rectified such violations would occasion cancellation of the insurance or a material increase in the premiums applicable to that portion of the coverage. The actual increase in the annual premium in order to secure fire coverage under the existing conditions amounted to approximately $4,000. The appellant promptly notified the appellee of the letter, the violations complained of, and the resulting loss of insurance or increased premium. The insurance company ultimately cancelled the insurance on June 2, 1975. The appellant thereupon procured fire insurance coverage in view of the requirements of his mortgage and demanded payment of same from the appellee/tenant. Unfruitful and nonproductive negotiations occurred over a period of months and eventually the appellee/tenant vacated the premises on October 10th or 11th of 1975. Subsequently, the appellant succeeded in reletting the premises in May of 1976 for a monthly rental of $290. Vacation of the premises by the appellee returned the cost of the fire insurance to approximately its pre-violation level.
As stated earlier, the tenant defended the action brought by the landlord on the ground of a constructive eviction by reason of "harassment." The only evidence in this regard is to be found in the following testimony of the appellee/tenant:
Q. [W]hat ... did the Plaintiff harass you about?
A. [I]t would be in terms of our lease arrangement....
Q. What in particular... .
A. Primarily it centered around an increase of rental request made by Bill Wolf, that we almost double our amount that we were paying per month, supposedly because of insurance. And this came up almost daily; several times a week.
Q. What happened?
A. Well, Bill came to work about eight o'clock in the morning, and you could almost count on him coming to the office and asking what our position on this was. [T]he insurance policy ... was cancelled and there were some reasons given which we tried to ascertain whether if in fact we did make these changes ...
[T]hat would decrease the premium.
.....
Q. What did Mr. Wolf tell you he wanted you to do?
A. Well, he wanted it solved. Really he wanted it solved, and it was my problem.
And in essence, his most urgent need was that I give him roughly $100.00 more a week because it was, there was 52 weeks in the year, and it was over $4,000.00. So it was going to amount to $400.00 a month increase in our cost of doing business.
Q. And then you could keep the cabinet shop or you had to get rid of the cabinet shop too?

*1257 A. No, I think we could have kept the cabinet shop, yes. That's the impression I was under.
The earliest appellate decision in Florida announcing the fundamentals of constructive eviction is found in the supreme court case of Hankins v. Smith, 103 Fla. 892, 138 So. 494 (1931). In that opinion the supreme court defined constructive eviction as an act by the landlord "which although not amounting to an actual eviction, is done with the express or implied intention, and has the effect, of essentially interfering with the tenant's beneficial enjoyment of the leased premises." 138 So. at 495. The supreme court went on to say that constructive eviction arises out of any wrongful act or any default or neglect of the landlord "whereby the leased premises are rendered unsafe, unfit or unsuitable for occupancy in whole, or in substantial part, for the purposes for which they were leased." 138 So. at 496. The basic authority cited and relied on by the supreme court was 36 C.J.S. Landlord & Tenant §§ 980, 992.
Most of the appellate decisions since that date have all cited and relied upon the Hankins definition and language essentially as stated above. See, e.g., Fountas v. Ziegler, 305 So.2d 864 (Fla.3d DCA 1974) (reversed on other grounds by the same court after remand to the circuit court) 338 So.2d 39 (Fla.3d DCA 1976); Richards v. Dodge, 150 So.2d 477 (Fla.2d DCA 1963). Perhaps the classic illustration of the typical constructive eviction is found in Berwick Corporation v. Kleinginna Investment Corp., 143 So.2d 684 (Fla.3d DCA 1962). (Covenant to keep roof watertight violated when premises rendered uninhabitable by water.)
Underlying or implicit in all the decisions is that the act of the landlord constituting the constructive eviction be wrongful, unwarranted or unlawful. Eviction, whether actual or constructive, to be actionable must be wrongful. Actionable eviction is "a wrongful act in the nature of a trespass ..." and "there can be no eviction from ... a termination of the lease for a default of the lessee in fulfilling his obligations under the lease... ." 52 C.J.S. Landlord & Tenant §§ 445, 447 (1968).
In Section 455 it is stated:
It is essential that there be wrongdoing on the part of the landlord, and a constructive eviction does not arise from an attempt by the landlord to hold the tenant to the terms of the lease.
For a more thorough discussion of wrongful eviction we refer the reader to 52 C.J.S. Landlord & Tenant §§ 445-461 (1968); 49 Am.Jur.2d Landlord & Tenant §§ 280-299 (1970).
Conceivably a wrongful eviction  actual or constructive  could occur in the acts of the landlord to enforce provisions of the lease but certainly there is nothing in the evidence in this case to suggest any such possibility.
Even assuming that the above testimony of the appellee/tenant established "harassment" and that such harassment could qualify as effecting an eviction, it was clearly predicated upon his material breach of the lease covenants and cannot form the basis of a wrongful eviction. The resulting increase in the insurance premium became the appellee's obligation under the provisions of the lease. If he chose not to pay (or correct the violations causing the increase) and vacated the premises he thereby voluntarily abandoned the lease.
We therefore reverse the judgment of the trial court and remand the cause for an entry of a judgment on the complaint of the appellant/landlord for such damages as the trial court may find are established by the evidence.
BOARDMAN, C.J., and DANAHY, J., concur.